UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PMP – ROMULUS, INC.,

    Plaintiff,

v.

VALYRIAN MACHINE, LLC, and
KRIS J. SURCEK,

    Defendants.

Case No. 23-cv-10822

Honorable Linda V. Parker

---

## OPINION AND ORDER GRANTING PLAINTIFF'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION

This matter is before the Court on the amended motion for a preliminary injunction brought by Plaintiff PMP – Romulus, Inc. ("PMP") against Defendants Valyrian Machine, LLC and its founder Kris J. Surcek ("Surcek"). This action arises out of Surcek's alleged taking of confidential and non-confidential information from his former employer, PMP, and use of that information for the benefit of his new company, Valyrian Machine, LLC.

In its Complaint filed April 11, 2023, PMP alleges: (I) misappropriation of trade secrets against all Defendants; (II) breach of contract against Surcek; (III) breach of duty of good faith, loyalty, and fair dealing against Surcek; (IV) tortious

interference against all Defendants; (V) common law unfair competition against all Defendants; and (VI) conversion against all Defendants.[1]

In the pending motion, PMP seeks a preliminary injunction enjoining Defendants from misappropriation of its trade secrets and non-trade secret property, as well as requiring Defendants to permanently delete all copies of files belonging to PMP. The Court held a hearing with respect to PMP's motion on October 4, 2023.

## I. Factual and Procedural Background

PMP, which acquired Future Tool and Machine, Inc. ("Future Tool") in early 2022, is in the automotive industry, fabricating custom parts based on blueprint drawings provided by its customers. Surcek had been employed by Future Tool for over twenty years, initially as an IT professional and eventually being promoted to the role of Operations Manager, a role that gave him access to all of his employer's computer systems.

After PMP acquired Future Tool, Surcek accepted employment with the new company and signed an employment agreement on January 24, 2022. The

---

[1] PMP's Complaint also includes a seventh count for preliminary and permanent injunctive relief. (*See* ECF No. 1 at PageID. 75.) A preliminary injunction is a remedy not a substantive cause of action. *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008) (noting that "[a] preliminary injunction is an extraordinary remedy," awardable only upon proof of likelihood of success on the merits of a substantive claim).

employment agreement referenced an employee handbook. Further, when Surcek started with Future Tool, he acknowledged an employee handbook which included a confidentiality provision which included, *inter alia*, business methods, pricing and business plans of the company. (*See* EF No. 16-4 at PageID 633.) Surcek, however, subsequently became concerned about his job security at PMP and began looking for other employment or an opportunity to start his own company. According to Surcek, PMP was looking to get out of the automotive industry and focus more on the aerospace business.

In late August 2022, Surcek became aware of an opportunity to purchase a company, Euclid Gauge ("Euclid"). Surcek made an offer to purchase Euclid, but contemporaneously also filed Articles of Organization with the State of Michigan for Valyrian Machine, LLC. Once Valyrian Machine, LLC was formed, but while still employed with PMP, Surcek began accepting requests for quotes from customers on its behalf. Some requests for quotes came from PMP's current customers. When Surcek's offer to purchase Euclid was accepted, he took ownership of Euclid and absorbed its assets into Valyrian Machine, LLC. (*See* ECF No. 21-5 at PageID. 952.) Surcek resigned from PMP shortly thereafter.

According to PMP's forensic computer expert, in the final weeks of his employment with PMP, Surcek's computer activity became drastically different. The number of files Surcek opened in these final weeks exceeded, by many

magnitudes, the files opened previously during his employment. Surcek attributes this to a change in work procedure. PMP's expert also provides that on the final days of Surcek's employment, Surcek inserted several USB drives into his computer and downloaded key pieces of information belonging to PMP and ran a computer cleaning software several times. Surcek then resigned without notice. Surcek argues that he only ran the computer cleaning software to remove personal information from his work computer. Furthermore, while PMP claims that the USB devices have never been recovered, Surcek maintains that he left them in his desk and only used USB drives for work related activity.

After his resignation, and PMP argues that even before, Surcek began competing against PMP in the marketplace. PMP argues that Surcek stole a variety of materials from PMP, including trade secrets in the form of confidential pricing information, which, PMP argues, would give a competitor an edge in a highly competitive marketplace. Surcek responds that, while he is aware of PMP's pricing scheme, that is only because customers have approached him with PMP's prices and, while he acknowledges that pricing information is confidential, he has never used PMP's pricing to gain a competitive advantage. (*See* ECF No. 17-2 at PageID 802-05.)

There appear to be at least four instances where Defendants have allegedly used PMP's pricing information to their advantage that did not come from the

4

customer: two while Surcek was still an employee of PMP; and two after Surcek resigned from PMP.  With respect to Surcek's use of PMP's pricing while employed by PMP, Surcek submitted a quote to potential customer of PMP that contained two bids that were about $100 lower than PMP for a single unit of production.  *Compare* ECF No. 16-14, *with* ECF No. 16-15 *and* ECF No. 16-16. PMP argues that Surcek had access to PMP's pricing information, as Surcek was still employed with PMP at the time he was competing against them and submitting these bids. They further argue that because Surcek had access to PMP's pricing information, Surcek was able to undercut PMP when submitting the quote to customers.

After Surcek resigned from PMP, they argue that Surcek was still using PMP's pricing information to underbid PMP in the marketplace.  One instance included Surcek being able to generate a quote six hours after being requested to do so, on a product that PMP has quoted in the past. Surcek was able to generate a quote that was $100 less than PMP's quoted price.  (*See* ECF No. 19-2.)  PMP again argues that Surcek had access to their confidential pricing information and was able to underbid them in the marketplace.  (*See* ECF No. 16 at PageID. 602 ("Because Valyrian had PMP's confidential pricing history for this part, Valyrian was able to submit a quote that was $100 less than PMP's quote.").)

5

Lastly, in Surcek's own deposition testimony, he acknowledged writing an email to a potential customer that his quote is higher than it was when he was an employee of PMP, formerly Future Tool, and disclosed PMP's pricing strategy to explain why his price was higher, in an unsuccessful attempt to secure a customer's business. (*See* ECF No. 21-5 at PageID 979 ("Our quote is attached. I know this is higher than we were at Future Tool in the past, back then, we would run extra parts for stock. That would spread out the setup costs and allow us to keep the pricing down. Let me know if you have any questions.").) PMP argues that this is another instance of Surcek misappropriating their trade secrets.

## II. Applicable Standard

When a party moves for a preliminary injunction, the district court considers four factors to determine whether to grant relief: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact on the public interest. *See Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2008). "[T]hese factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).

"[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited

circumstances which clearly demand it.'" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)). The party moving for the injunction has the burden to show that the circumstances clearly demand it. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

### III. Applicable Law and Analysis

#### A. PMP's Likelihood of Success on the Merits

PMP argues that it is likely to succeed on the merits of all of its claims. The Court finds that there is a strong likelihood of success on PMP's misappropriation of trade secrets claim and, therefore, focuses on that claim here. Specifically, the Court focuses on Surcek's email, wherein, he disclosed PMP's pricing strategy in an unsuccessful attempt to secure a customer's business.

The elements of a misappropriation of trade secrets action under Michigan law are: (1) the existence of a trade secret; (2) its acquisition in confidence; and (3) the defendant's unauthorized use of it. *See Aerospace Am., Inc. v. Abatement Techs. Inc.*, 738 F. Supp. 1061, 1069 (E.D. Mich. 1990); *see also Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 903 (E.D. Mich. 2005) ("Under Michigan law, a court may enjoin actual or threatened misappropriation of a trade secret and may compel affirmative acts to protect a trade secret.").

The Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*, and the Michigan Uniform Trade Secrets Act (MUTSA), M.C.L. § 445.1902 *et seq.*, both define misappropriation as:

> (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
>> (A) used improper means to acquire knowledge of the trade secret;
>> (B) at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use; or
>> (C) before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b); 18 U.S.C. § 1839(5); *see also RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020) (finding that "federal law defines 'misappropriation' and 'trade secret' in similar ways" and "assum[ing] (without deciding) that the federal law follows the same standards as the state law.").

The DTSA defines a trade secret as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled,

>or memorialized physically, electronically, graphically, photographically, or in writing if:
>
>>(A) the owner thereof has taken reasonable measures to keep such information secret; and
>>(B) the information derives independent economic value actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The MUTSA defines a trade secret as:

>[I]nformation, including a formula, pattern, compilation, device, method, technique, or process, that is both the following:
>
>>(1) Derives independent value actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use.
>>(2) Is the subject of efforts that are reasonable under the circumstances, to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d).

For the Court to issue a preliminary injunction based on a misappropriation claim, the trade secret must be "specifically identified, and its unique economic value explained as Michigan courts have held that an alleged trade secret must be identified clearly, unambiguously, and with specificity." *RGIS, LLC v. Gerdes*, No. 19-11866, 2019 WL 3958392, at *5 (E.D. Mich. Aug. 21, 2019) (quotation omitted). Moreover, "[a] trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue." *Allis-*

9

*Chalmers Mfg. Co. v. Cont'l Aviation and Eng'g Corp.*, 255 F. Supp. 645, 654 (E.D. Mich. 1966).

PMP's pricing information is likely a trade secret; likely acquired in confidence; and Surcek likely did not have authority to use or disclose that information in the bidding process.

"Knowledge of vendors, vendor capabilities, *and pricing* can be a trade secret even if all of the information can be obtained through publicly available means so long as the information is not readily ascertainable." *Gaisson Aerospace Sci. Inc. v. RCO Eng'g, Inc.*, 680 F. Supp. 2d 830, 843 (E.D. Mich. 2010) (emphasis added) (citing *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 612, 630 (E.D. Mich. 2005)); *see also PrimePay, LLC v. Barnes*, No. 14-11838, 2015 WL 2405702, at *22 (E.D. Mich. May 20, 2015) (alteration in original) (quotation omitted) ("An employer's pricing schemes, the details of its customer contacts, its markups, [and] employee information are examples of possible trade secrets under the MUTSA.").

"The first criterion for MUTSA trade-secret status would be satisfied by internal pricing information because a competitor … could 'obtain economic value' from its disclosure, *i.e.*, could use knowledge of the pricing information to craft a bid that would have a better chance of winning the new contract." *Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, 602 F. Supp. 2d 829,

10

853 (W.D. Mich. 2008). Surcek's email to a customer disclosing how PMP keeps its pricing lower than Valyrian Machine, LLC, in an attempt to be awarded the customer's business at PMP's expense, is the type of financial information that, if shared, could give a competitive advantage in the marketplace and is likely a trade secret.

Here, PMP demonstrates that Surcek likely acquired PMP's pricing information and trade secrets in confidence while an employee of PMP, and, according to his deposition transcript, disclosed that trade secret while competing against PMP on behalf of Valyrian Machine, LLC. (*See* ECF No. 16-4 at PageID 633.) Additionally, PMP took steps to protect its trade secrets by creating company policies to ensure confidential information would not be shared as well as password protecting their computer systems to safeguard their company.

At oral argument, Defendants did not rebut PMP's position that pricing information is confidential. (*See* ECF No. 22 at PageID 1167 ("[T]he pricing and other internal information we agree that that's PMP's confidential information. We take that stance.").) Based on this, it appears that Surcek disclosed PMP's confidential pricing strategy to compete with PMP. As a result, PMP has a strong likelihood of success on the merits of its misappropriation of trade secrets claim.

In their brief, PMP raised two additional instances which they believe evidence a misappropriation of trade secrets. (*See* ECF No. 16 at PageID. 602.)

11

The two instances raised relate to two quotes that Defendants were able to provide which Plaintiff argues are further evidence of misappropriation of trade secrets: Quote No. 10003; and Quote No. 10015

Quote Nos. 10003 and 10015 pertain to Defendants alleged ability to create quotes without having the customer's blueprints or drawings, leading PMP to the conclusion that Surcek used blueprints that were in PMP's possession. Notably, Surcek created Quote No. 10003 while he was still employed with PMP and Quote No. 10015 after he resigned. While the blueprints are likely confidential, PMP has not made a showing, nor is the Court making a finding, that drawings shared by the customer to PMP are PMP's trade secrets. Therefore, alleged use of them would not evidence a misappropriation of trade secrets claim.

### B. Irreparable Harm

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578 (citation omitted). PMP argues that it will suffer irreparable harm in the form of a loss of customer goodwill. "A loss of customer goodwill often amounts to irreparable injury." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "It is well established that the disclosure of trade secrets qualifies as irreparable harm." *Broad-Ocean Techs., LLC v. Lei*, No. 21-11297, 2021 WL 2258418, at *2 (E.D. Mich. June 3, 2021); *see also Uniroyal Goodrich Tire Co. v.*

*Hudson*, 873 F. Supp. 1037, 1048-49 (E.D. Mich. 1994) (alteration added) (finding irreparable harm where "the disclosure of [the plaintiff's] trade secrets or confidential or proprietary information could cause significant, immeasurable injury"); *Henkel Corp.*, 386 F. Supp. 2d at 904 (alteration added) ("Because there is evidence of both threatened and actual misappropriation of trade secrets, without injunctive relief, [Plaintiff] would likely suffer competitive losses and losses of customer goodwill as a result of Defendants' actions. Such losses are inherently difficult to calculate and are sufficient to support an injunction.").

Here, the strongest evidence of misappropriation of PMP's trade secrets is Surcek disclosing PMP's pricing strategy in an unsuccessful bid for a customer's business. Defendants' disclosure of Plaintiff's pricing information in the bidding process, allows the opportunity for Defendants to gain a competitive advantage in the marketplace.

### C. Substantial Harm to Others

Defendants argue that a preliminary injunction will harm its employees and third parties, such as Defendants' clients. This factor does not appear particularly relevant as Defendants will be able to operate their business, albeit without unfairly using PMP's trade secrets. As a result, "the court's decision will not have an impact on anyone besides the parties to this litigation." *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 610 (E.D. Mich. 2015) (citing *Patio Enclosures, Inc.*

13

*v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002)). Therefore, there is no substantial harm to others by the preliminary injunction.

### D. The Impact on The Public Interest

Lastly, the public interest would be served by the entry of a preliminary injunction. "The public has an interest in protecting trade secrets and it is 'axiomatic that the public has an interest in the enforcement of the legislative enacted laws.'" *Dearborn Mid-West Co., LLC v. FM Sylvan, Inc.*, No. 22-12114, 2022 WL 16716217, at *14 (E.D. Mich. Nov. 4, 2022) (quoting *Radiant Global Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1135 (E.D. Mich. 2019)). As a result, this factor weighs in favor of granting the preliminary injunction.

### IV. Conditions on the Issuance of the Injunction

Federal Rule of Civil Procedure 65 provides, in relevant part, that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Sixth Circuit advises district courts to expressly address the question of whether a bond is required as security for a preliminary injunction. *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). Nevertheless, the ultimate decision of the issue is within the discretion of the trial judge. *See id.*; *see also USACO Coal Co. v. Carbomin*

*Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982).  In this case, Defendants have requested that PMP post bond but fail to allege what costs or damages they would sustain if an injunction is ordered.  *See SEIU Healthcare Mich. v. Snyder*, 875 F. Supp. 2d 710, 726 (E.D. Mich. 2012) (holding a party must "allege[] that they would sustain . . . costs or damages if an injunction is ordered" for the Court require bond). Therefore, the Court finds that no bond is necessary in this case.

## V.  Conclusion

For the reasons set forth above, the Court concludes that the relevant considerations weigh in favor of entering the requested preliminary injunction.

Accordingly,

**IT IS ORDERED** that Plaintiff's Amended Motion for Preliminary Injunction (ECF No. 16) is **GRANTED** and Defendants are enjoined from using PMP's trade secrets to conduct their business.

s/ Linda V. Parker  
LINDA V. PARKER  
U.S. DISTRICT JUDGE

Dated: October 30, 2023